**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x
WELLS FARGO BANK, N.A., as Trustee,

                             Interpleader Plaintiff,

              v.

WRIGHTS MILL HOLDINGS, LLC, BROGNO, LLC,
ETON PARK CAPITAL MANAGEMENT,
MONTROSE CREDIT I, LLC, MONTROSE CREDIT
II, LLC, MONTROSE CREDIT III, LLC, MONTROSE
CREDIT IV, LLC, WATERFALL ASSET
MANAGEMENT, MOISHE GUBIN, CEDE & CO.,
and DOES 1 through 100, owners of beneficial interests
in the Notes,

                             Interpleader Defendants.

ECF CASE

14 Civ. 9783 (PAE)

**ANSWER OF ETON PARK
CAPITAL MANAGEMENT, L.P.,
AND ANSWER, CROSSCLAIMS,
COUNTERCLAIMS AND
THIRD-PARTY COMPLAINT
OF MONTROSE CREDIT I, LLC,
MONTROSE CREDIT II, LLC,
MONTROSE CREDIT III, LLC,
AND MONTROSE CREDIT IV,
LLC**

-----------------------------------------------------------------------x

MONTROSE CREDIT I, LLC, MONTROSE CREDIT
II, LLC, MONTROSE CREDIT III, LLC, and
MONTROSE CREDIT IV, LLC,

                         Crossclaimants,

              v.

WRIGHTS MILL HOLDINGS, LLC and MOISHE
GUBIN,

                         Crossclaim Defendants.

-----------------------------------------------------------------------x

MONTROSE CREDIT I, LLC, MONTROSE CREDIT
II, LLC, MONTROSE CREDIT III, LLC, and
MONTROSE CREDIT IV, LLC,

                         Counterclaimaints,

              v.

WELLS FARGO BANK, N.A., as Trustee,

                         Counterclaim Defendant.

-----------------------------------------------------------------------x

---------------------------------------------------------------------x

MONTROSE CREDIT I, LLC, MONTROSE CREDIT
II, LLC, MONTROSE CREDIT III, LLC, and
MONTROSE CREDIT IV, LLC,

                              Third-Party Plaintiffs,
             v.

TROPIC CDO IV, LTD. and TROPIC CDO IV CORP.,

                              Third-Party Defendants.
---------------------------------------------------------------------x

      Interpleader Defendant Eton Park Capital Management, L.P., and Interpleader

Defendants and Crossclaimants, Counterclaimants and Third-Party Plaintiffs Montrose Credit I,

LLC, Montrose Credit II, LLC, Montrose Credit III, LLC, and Montrose Credit IV, LLC

(collectively, "the Montrose Entities" and together with Eton Park Capital Management, L.P.,

"Eton"), by their undersigned attorneys, for their Answer to the Interpleader Complaint (the

"Complaint") of Wells Fargo Bank, N.A. ("Wells Fargo" or the "Trustee"), Counterclaims,

Crossclaims, and Third-Party Claims respond and allege as follows, on knowledge as to

themselves and their own acts and on information and belief as to all other matters:

## **ANSWER**

      1.      Eton admits the allegations of paragraph 1 of the Complaint, except Eton has

insufficient knowledge to admit or deny whether Wells Fargo can or "cannot determine, without

hazard to itself, how to proceed" with respect to a certain item of Portfolio Collateral.

      2.      Eton admits the allegations of paragraph 2 of the Complaint.

      3.      Eton has insufficient knowledge to admit or deny the allegations of paragraph 3 of

the Complaint.

4.    Eton admits the allegations of paragraph 4 of the Complaint.

5.    Eton admits, on information and belief, the allegations of paragraph 5 of the Complaint.

6.    Eton has insufficient knowledge to admit or deny the allegations of paragraph 6 of the Complaint.

7.    Eton has insufficient knowledge to admit or deny the allegations of paragraph 7 of the Complaint.

8.    Eton admits the allegations of paragraph 8 of the Complaint, except denies that Eton Park Capital Management, L.P. is a Noteholder of certain Class A-1L, A-2L and A-4L Notes Issued by Tropic CDO IV Ltd and states that Eton Park Capital Management, L.P. is the investment manager of the Montrose Entities.

9.    Eton admits the allegations of paragraph 9 of the Complaint.

10.    Eton admits the allegations of paragraph 10 of the Complaint.

11.    Eton admits the allegations of paragraph 11 of the Complaint.

12.    Eton admits the allegations of paragraph 12 of the Complaint.

13.    Eton has insufficient knowledge to admit or deny the allegations of paragraph 13 of the Complaint.

14.    Eton has insufficient knowledge to admit or deny the allegations of paragraph 14 of the Complaint.

15.    Eton admits, on information and belief, the allegations of paragraph 15 of the Complaint.

16.    Eton has insufficient knowledge to admit or deny the allegations of paragraph 16 of the Complaint.

17.     Eton admits the allegations of paragraph 17 of the Complaint.

18.     Eton admits the allegations of paragraph 18 of the Complaint.

19.     Eton has insufficient knowledge to admit or deny the allegations of paragraph 19

of the Complaint except admits that Section 10.3(d) of the Indenture provides:

> (d)     The Trustee on behalf of the Issuer shall notify the Holders of the Preferred Shares of any Portfolio Collateral that is subject to an Offer. If no Event of Default has occurred and is continuing and subject to the provisions of Article XII hereof, the Holders representing at least 66-2/3% of the Preferred Shares may direct the Trustee to release from the lien of this Indenture such Portfolio Collateral in accordance with the terms of the Offer in each case against receipt of payment therefor.

Eton further avers that the Indenture defines an "Offer" as follows:

> With respect to any security, (a) any offer by the issuer of such security or by any other person made to all of the holders of such class of security to purchase or otherwise acquire all such securities (other than pursuant to any redemption in accordance with the terms of the related Underlying Instruments) or to exchange such securities for any other security or other property or (b) any solicitation by the issuer of such security or any other Person to amend, modify or waive any provision of such security or any related Underlying Instrument.

20.     Eton has insufficient knowledge to admit or deny the allegations of paragraph 20

of the Complaint except admits that the text of Section 10.3(d) of the Indenture is set forth in the

immediately preceding paragraph of this Answer.

21.     Eton has insufficient knowledge to admit or deny the allegations of paragraph 21

of the Complaint except admits that Section 12.2 of the Indenture provides:

> Holders representing at least 66-2/3% of the Preferred Shares may direct the Trustee to sell an item of Portfolio Collateral that is the subject of an Offer or call for redemption, if, together with its direction to sell such security, such Holders certify to the Trustee that the sales price for such Security is equal to or greater than the price available pursuant to such Offer or call and such sale will be treated as if the Offer or call were consummated for purposes of determining the Collections for the Due Period relating to the date on which such sales occurs.

22.     Eton has insufficient knowledge to admit or deny the allegations of paragraph 22 of the Complaint, except admits on information and belief that Interpleader Defendant Brogno delivered to Wells Fargo a letter dated July 25, 2014 directed to the Issuer and Wells Fargo (the "Brogno July 25, 2014 Letter"), and respectfully refers the Court to the Brogno July 25, 2014 Letter for its terms.

23.     Eton has insufficient knowledge to admit or deny the allegations of paragraph 23 of the Complaint, except admits on information and belief that Interpleader Defendant Brogno delivered to Wells Fargo a letter dated July 25, 2014 directed to the Issuer and Wells Fargo, and respectfully refers the Court to the Brogno July 25, 2014 Letter for its terms.

24.     Eton has insufficient knowledge to admit or deny the allegations of paragraph 24 of the Complaint.

25.     Eton has insufficient knowledge to admit or deny the allegations of paragraph 25 of the Complaint, except admits, on information and belief, that Wells Fargo sent the Brogno July 25, 2014 Letter to holders of the Preferred Shares in Tropic CDO IV together with a Notice of Offer and Request for Direction; admits that Eton has received a copy of the Brogno July 25, 2014 Letter; and further states that the Notice of Offer and Request for Direction were unauthorized by, and contrary to, the terms of the Indenture.

26.     Eton has insufficient knowledge to admit or deny the allegations of paragraph 26 of the Complaint, except admits that on August 15, 2014, Eton Park Capital Management, L.P. on behalf of the Montrose Entities sent an email to Wells Fargo objecting to the Brogno July 25, 2014 Letter and respectfully refers the Court to that email for its terms.

27.     Eton has insufficient knowledge to admit or deny the allegations of paragraph 27 of the Complaint, except admits upon information and belief that Joseph Hage Aaronson LLC

("JHA") sent a letter to Wells Fargo dated August 25, 2014 on behalf of the Montrose Entities (the "JHA August 25, 2014 Letter"), and respectfully refers the Court to the JHA August 25, 2014 Letter for its terms.

28.　Eton has insufficient knowledge to admit or deny the allegations of paragraph 28 of the Complaint, except admits upon information and belief that JHA sent a letter to Wells Fargo dated August 25, 2014 on behalf of the Montrose Entities, and respectfully refers the Court to the JHA August 25, 2014 Letter for its terms.

29.　Eton has insufficient knowledge to admit or deny the allegations of paragraph 29 of the Complaint, except admits on information and belief that Interpleader Defendant Brogno delivered to Wells Fargo a letter dated September 22, 2014; admits, on information and belief, that Wells Fargo sent the September 22, 2014 Letter to holders of the Preferred Shares in Tropic CDO IV; admits that Eton has received a copy of the September 22, 2014 Letter; and respectfully refers the Court to the September 22, 2014 Letter for its terms.

30.　Eton has insufficient knowledge to admit or deny the allegations of paragraph 30 of the Complaint, except admits on information and belief that Interpleader Defendant WMH sent a letter to Wells Fargo dated October 14, 2014 and respectfully refers the Court to the October 14, 2014 Letter for its terms.

31.　Eton has insufficient knowledge to admit or deny the allegations of paragraph 31 of the Complaint, except admits on information and belief that Interpleader Defendant WMH sent a letter to Wells Fargo dated October 14, 2014 and respectfully refers the Court to the October 14, 2014 Letter for its terms.

32.　Eton has insufficient knowledge to admit or deny the allegations of paragraph 32 of the Complaint, except admits that Eton has received a copy of the October 14, 2014 Letter.

33. Eton has insufficient knowledge to admit or deny the allegations of paragraph 33 of the Complaint, except admits on information and belief that Interpleader Defendant Waterfall sent a letter to Wells Fargo dated October 31, 2014 (the "Waterfall October 31, 2014 Letter"), and respectfully refers the Court to the Waterfall October 31, 2014 Letter for its terms.

34. Eton has insufficient knowledge to admit or deny the allegations of paragraph 34 of the Complaint, except admits on information and belief that Interpleader Defendant Waterfall sent a letter to Wells Fargo dated October 31, 2014, and respectfully refers the Court to the Waterfall October 31, 2014 Letter for its terms.

35. Eton has insufficient knowledge to admit or deny the allegations of paragraph 35 of the Complaint, except admits on information and belief that Interpleader Defendant Waterfall sent a letter to Wells Fargo dated October 31, 2014, and respectfully refers the Court to the Waterfall October 31, 2014 Letter for its terms.

36. Eton has insufficient knowledge to admit or deny the allegations of paragraph 36 of the Complaint, except admits upon information and belief that JHA sent a letter to Wells Fargo dated November 6, 2014 on behalf of the Montrose Entities (the "JHA November 6, 2014 Letter"), and respectfully refers the Court to the JHA November 6, 2014 Letter for its terms.

37. Eton has insufficient knowledge to admit or deny the allegations of paragraph 37 of the Complaint, except admits upon information and belief that JHA sent a letter to Wells Fargo dated November 6, 2014 on behalf of the Montrose Entities, and respectfully refers the Court to the JHA November 6, 2014 Letter for its terms.

38. Eton has insufficient knowledge to admit or deny the allegations of paragraph 38 of the Complaint, except admits upon information and belief that JHA sent a letter to Wells

Fargo dated November 6, 2014 on behalf of the Montrose Entities, and respectfully refers the Court to the JHA November 6, 2014 Letter for its terms.

39.     Eton has insufficient knowledge to admit or deny the allegations of paragraph 39 of the Complaint.

40.     Eton has insufficient knowledge to admit or deny the allegations of paragraph 40 of the Complaint.

41.     Eton admits, on information and belief, the allegations of paragraph 41 of the Complaint except denies that the Trustee is unable to determine how to proceed in respect of the proposed sale of the Security, inasmuch as the Indenture instructs the Trustee how to proceed.

42.     Eton has insufficient knowledge to admit or deny the allegations of paragraph 42 of the Complaint.

43.     Eton has insufficient knowledge to admit or deny the allegations of paragraph 43 of the Complaint.

44.     Eton has insufficient knowledge to admit or deny the allegations of paragraph 44 of the Complaint.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

45.     The Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

46.     The Complaint does not plead sufficient facts to enable Eton to determine all applicable arguments, claims, and defenses with respect to the underlying dispute.  Eton therefore reserves its right to assert all additional defenses once those facts, and the precise nature of the parties' claims, can be ascertained.  Eton reserves all affirmative defenses that may be revealed during the course of discovery.

## THE MONTROSE ENTITIES' CROSSCLAIMS, COUNTERCLAIMS, AND THIRD-PARTY CLAIM

### Nature of the Claims

47.     The Montrose Entities' claims arise from a bad-faith attempt by Interpleader and Crossclaim Defendants WMH and Gubin to strip valuable collateral from Tropic IV.  Tropic IV was structured as an asset-backed security whose value and payments are derived from a portfolio of fixed-income underlying assets.  It is split into different risk classes, or tranches, and senior notes are considered the safest securities.  The payments to noteholders of the CDO ("Noteholders") are secured by collateral that is owned by the CDO and maintained by the Trustee for their benefit (the "Portfolio Collateral").  The holders of Preferred Shares of the CDO (the "Preferred Shareholders") are the junior-most stakeholders.  It was never intended that the

9

Preferred Shareholders benefit from the Portfolio Collateral at the expense of the senior interests, and the governing documents do not permit it.

48.    The senior notes were sold to the Montrose Entities and the other noteholders on the understanding that (a) the Portfolio Collateral was held for the benefit of the noteholders by Tropic CDO IV, Ltd. and Tropic CDO IV Corp. (together the "Issuers"), in order of seniority, and only after the obligations to all noteholders were satisfied, for the benefit of the Preferred Shareholders; (b) the Portfolio Collateral could not be sold except by the Issuers and Trustee after they had determined, consistent with their contractual and fiduciary duties, that a sale was in the best interests of the CDO and its creditors as a whole; and (c) if such a determination had been made by the Issuers and Trustee in connection with a viable offer to purchase the Portfolio Collateral, a supermajority of Preferred Shareholders could direct the sale of the Portfolio Collateral to a different purchaser for a higher price.

49.    The definition of "Offer" in the Indenture provides that any Offer to purchase Portfolio Collateral must be made to the Issuers as the "holders" of the Portfolio Collateral. Where an Offer to purchase Portfolio Collateral is made, the Issuers and Trustee have the exclusive rights to sell, and they may not accept the Offer unless it comports with their contractual and fiduciary duties and the liens on the Portfolio Collateral are released.  Under Section 7.8 of the Indenture, the Issuers and Trustee are barred from selling the Portfolio Collateral except as expressly permitted in the Indenture.

50.    Section 10.3 of the Indenture does not authorize the Preferred Shareholders to accept an Offer.  Rather, it sets forth the procedure by which the Issuers and Trustee can obtain releases of liens on the Portfolio Collateral in connection with any sale the Issuers or Trustee determine to make.  Subsection 10.3(d) requires the Trustee, on behalf of the Issuers, to notify

the Preferred Shareholders of any Portfolio Collateral that is subject to an Offer.  The Trustee may release the liens on that Portfolio Collateral only if the holders of at least 66-2/3% of the Preferred Shares direct the Trustee to do so.

51.     This procedure for release of liens on Portfolio Collateral confers on Preferred Shareholders the right to veto a sale of Portfolio Collateral by an Issuer or the Trustee.  That is, where the Issuer or Trustee desires to sell Portfolio Collateral, it may not do so if more than one-third of the Preferred Shareholders disapprove.  This veto right of the Preferred Shareholders does not constitute the power to direct a sale of Portfolio Collateral.

52.     On July 25, 2014, Interpleader Defendant Brogno purported to make an Offer to purchase certain Portfolio Collateral of Tropic IV at a fraction of the value of the Portfolio Collateral.  Brogno reached out to the Preferred Shareholders to direct the Trustee to accept his purported Offer — based on a complete distortion of the lien-release procedure in Section 10.3 and contrary to the terms and conditions of the Indenture — and sought to buy the Preferred Shareholders' consent to the purchases by promising them financial inducements to which they are not lawfully entitled and which, under the Indenture, belong to the CDO.

53.     Although consent was ostensibly obtained from Interpleader Defendant Wright Mill Holdings LLC ("WMH"), as holder of more than 66-2/3% of the Preferred Shares, the Trustee and the Issuers did not determine that Brogno's proposal was in fact a viable Offer which they could accept consistent with their fiduciary and contractual obligations and the negative covenants of the Indenture.  Without an acceptance, the Brogno Offer expired by its own terms on October 23, 2014.

54.     Notwithstanding that it never was, and that it no longer can be, a viable Offer to purchase the Portfolio Collateral, the Brogno Offer is now being used as the predicate for

WMH's October 14, 2014 instruction to the Trustee to sell the Portfolio Collateral to Interpleader Defendant Moishe Gubin ("Gubin"), based on a distortion of Section 12.2 of the Indenture. WMH has certified that Gubin is prepared to pay $800,000 for the Portfolio Collateral, which is higher than the price in Brogno's Offer but is still a miniscule fraction of the Collateral's actual worth.

55.    The potential sale of Portfolio Collateral to Gubin at WMH's instruction would strip Tropic IV of valuable Collateral to the detriment of the Montrose Entities and other Noteholders and would have a significant adverse financial effect on Tropic IV.

56.    The Montrose Entities seek to preserve the Portfolio Collateral for the benefit of all Noteholders who, like the Montrose Entities, were granted a first priority interest in the Collateral (among other trust assets, collectively, the "Trust Estate") in exchange for their investments.

57.    The Montrose Entities seek declaratory relief with respect to the conduct of the Trustee, Issuers, WMH and Gubin, as it pertains to the potential sale of the Portfolio Collateral to Gubin.  Specifically, the Montrose Entities seek declarations that the Trustee and Issuers lack authority to consummate any sale of Portfolio Collateral because (i) such sale is precluded under the express terms and conditions of the Indenture, (ii) there is no extant offer to purchase the Portfolio Collateral which could conceivably form the basis for any sale of the Portfolio Collateral under Section 12.2 of the Indenture, and (iii) such sale would amount to an impermissible fraudulent conveyance.  In the alternative, the Montrose Entities seek reformation of the Indenture to make it clear that the Preferred Shareholders lack the power to direct the sale of Portfolio Collateral based on the unacceptable and expired Brogno Offer, as any such power would clearly be a product of mutual mistake and completely contrary to the parties'

understanding at the time the CDO was created and the senior notes were issued.  These claims are counterclaims against the Trustee, cross-claims against WMH and Gubin, and third-party claims against the Issuers.

58.    Should the Montrose Entities prevail and the Portfolio Collateral remain in the Trust Estate, it would not disturb or prejudice the rights of any other Noteholder.  Rather, it would preserve the Trust Estate assets for the ratable benefit of all Noteholders under the terms of the Indenture.

### The Parties

59.    Interpleader Defendants, Counterclaimants, Crossclaimants and Third-Party Plaintiffs the Montrose Entities are Delaware Limited Liability companies whose members are citizens of the Cayman Islands.  The Montrose Entities collectively hold aggregate principal amount of approximately $33,130,000 of Tropic IV Class A-1L, A-2L and A-4L Notes (the "Senior Notes").

60.    On information and belief, Interpleader Plaintiff and Counterclaim Defendant Wells Fargo Bank, N.A. (the Trustee) is a national banking association with its main office in Sioux Falls, South Dakota.

61.    On information and belief, Third-Party Defendant Tropic CDO IV, Ltd. is an exempted company with limited liability organized under the laws of the Cayman Islands

62.    On information and belief, Third-Party Defendant Tropic CDO IV Corp. is a Delaware company with its principal place of business in Delaware.

63.    On information and belief, Interpleader Defendant and Crossclaim Defendant WMH is a New York limited liability company and is the holder of record of approximately 67.2% of the Preferred Shares of the Tropic IV CDO.

64.     On information and belief, Interpleader Defendant and Crossclaim Defendant Gubin is a resident of the state of Indiana.  Gubin is the Chairman of the Board of Directors of Optimum Bank Holdings, Inc. and its sole subsidiary, OptimumBank.

## Jurisdiction and Venue

65.     This Court has jurisdiction over these Crossclaims, Counterclaims, and Third-Party Claims pursuant to 28 U.S.C. §1367(a) in that the Crossclaims, Counterclaims and Third-Party Claims are so related to claims in the Interpleader Complaint that they form part of the same case or controversy under Article III of the United States Constitution.

66.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(3) and 1397.

## Background

**The Montrose Entities' Investment in The CDO**

67.     The Montrose Entities own aggregate principal amount of approximately $33,130,000 of Tropic IV Senior Notes, which are governed by an Indenture dated November 18, 2004, by and among Tropic CDO IV Ltd., as Issuer, Tropic CDO IV Corp., as Co-Issuer, and Wells Fargo, as Trustee (the "Tropic IV Indenture").

68.     As the owners of notes in Tropic IV, the Montrose Entities are creditors of that CDO within the meaning of New York's Debtor Creditor Law ("DCL").

69.     From the time the beneficial owners of the Montrose Entities first invested in Tropic IV, it was the understanding of the parties that the Portfolio Collateral would consist of illiquid investments, with no actively traded market, and that the CDO was established as, and would continue to be, a static vehicle with no active management of Collateral.  As a result, no Portfolio Collateral would be sold except under the circumstances set forth in the Indenture and

described in the Offering Circular pursuant to which the Senior Notes were sold (the "Offering Memorandum").

70.     The Portfolio Collateral sale limitations in the Indenture conferred on the Montrose Entities and similarly-situated Noteholders the right and reasonable expectation that no third party (such as Gubin) would be able to cherry pick the Collateral and leave the CDO — and the Noteholders — with a mix of Portfolio Collateral that is substantially and materially different (as well as of lower credit quality) from the pool of assets they expected to secure the payments on the Notes.

**The Indenture**

71.     The Indenture contains several provisions that govern and confirm the Trustee's obligations to act with respect to the Portfolio Collateral for the benefit of the CDO's Noteholders and not for the benefit of the CDO's Preferred Shareholders, some of which are set forth below.

72.     The Granting Clause of the Indenture provides:

> The Issuer hereby Grants to the Trustee, <u>for the benefit and security of the Holders of the Notes</u> and for the benefit of the Trustee, the Paying and Transfer Agent, the Collateral Administrator, the Securities Intermediary and the Hedge Counterparties a first priority security interest in all of its right, title and interest, whether now existing or hereafter acquired or arising, in, to and under the following … *provided* that such security interest shall not extend to any property, cash or other amounts specifically released from the lien of this Indenture or otherwise to be paid to the Issuer in accordance with the terms hereof.

[Emphasis added.]

73.     Section 5.14 of the Indenture is entitled *Control by Noteholders* and provides that, "[n]otwithstanding any other provision of this Indenture, <u>the Requisite Noteholders</u> . . . <u>shall</u>

have the right . . . to direct the Trustee" as to "any right, remedy, trust or power," subject to Trustee indemnification under 6(e) (emphasis added).

74.    Section 6.17, entitled *Fiduciary for Noteholders*, provides that "the Delivery of any item of Collateral to the Trustee is to the Trustee as Trustee for the Noteholders and agent for the Paying and Transfer Agent, the Collateral Administrator, the Securities Intermediary and the Hedge Counterparties" and that "the possession by the Trustee of any item of Collateral and the endorsement to or registration in the name of the Trustee of any item of Collateral (including without limitation as entitlement holder of the Collateral Account) are all undertaken by the Trustee in its capacity as Trustee for the Noteholders and agent for the Paying and Transfer Agent and (solely for the purposes of the Granting Clauses hereof) the Hedge Counterparties" (emphasis added).  *See also* Section 12.3(b) Underlying Instruments (Requisite Noteholder right to direct Trustee as to any item of collateral in default).

75.    Section 7.8(a) of the Indenture sets forth certain *Negative Covenants* and specifically provides that:  "The Issuer will not: (1) sell, transfer, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (or permit to occur or suffer such to exist), any part of the Trust Estate, except as expressly permitted by this Indenture . . . . " (emphasis added).  Similarly, § 7.8(c) of the Indenture specifically provides that:  "The Trustee shall not sell, transfer, exchange or otherwise dispose of, or enter into or otherwise engage in any business with respect to, any part of the Trust Estate, except as expressly permitted by this Indenture." (emphasis added).

76.    In addition, the Indenture contains several provisions that bear on Brogno's financial inducement to Preferred Shareholders and the Preferred Shareholders' clear inability to direct a sale of Portfolio Collateral in response to the Brogno Offer.

77.     Section 1.1 of the Indenture defines an "Offer" as follows:

With respect to any security, (a) any offer by the issuer of such security or by any other person made to all of the holders of such class of security to purchase or otherwise acquire all such securities (other than pursuant to any redemption in accordance with the terms of the related Underlying Instruments) or to exchange such securities for any other security or other property or (b) any solicitation by the issuer of such security or any other Person to amend, modify or waive any provision of such security or any related Underlying Instrument.

78.     Section 1.1 of the Indenture defines "Collateral Principal Collections" to include:

(i) all payments of any principal with respect to any Portfolio Collateral (other than Reinvestment Income thereon and amounts described in clause (ii) of the definition of 'Collateral Interest Collections' herein) in the Trust Estate (including, without limitation, principal recoveries and prepayments of the Principal Balance) and principal payments received in connection with or any payments received with respect to any Defaulted Portfolio Collateral in connection with a consent or solicitation and (ii) with respect to the Effective Date, any remaining Deposit (but excluding any Reinvestment Income thereon and subject to Section 3.4(d) hereof) not applied (a) to purchase Portfolio Collateral, (b) to effect an Initial Deposit Redemption or (c) as additional Collateral Interest Collection as described in Section 3.4(d) hereof. Notwithstanding the foregoing, Collateral Principal Collections shall include any other amounts not included in Collateral Interest Collections or Available Adjusted Collateral Interest Collections.

[Emphasis added.]

79.     Section 1.1 of the Indenture defines "Collateral Interest Collections" to include "the sum of (i) all payments of interest with respect to any Portfolio Collateral (including any receipts of accrued interest, dividends, any Premium paid in connection with the prepayment of any Portfolio Collateral, as well as any payments (other than principal or with respect to Defaulted Portfolio Collateral) received pursuant to a consent or similar solicitation which are received during the applicable Due Period" (emphasis added).

80.     Section 11.1(b) of the Indenture contains "waterfall" provisions pursuant to which the Noteholders and equity holders are to receive payments due under the Indentures.

17

81.     In the Granting Clause of the Indenture, the Issuer has granted to the Trustee for the benefit of Noteholders, the Portfolio Collateral "and <u>all payments thereon or with respect thereto</u>" (emphasis added).  The Granting Clause of the Indenture explains that Collateral may only be removed from the Trust if it is "specifically released from the lien of this Indenture or otherwise to be paid to the Issuer in accordance with the terms hereof."

82.     Section 10.3(d) of the Indenture provide the mechanism for releasing such liens:

> The Trustee on behalf of the Issuer shall notify the Holders of the Preferred Shares of any Portfolio Collateral that is subject to an Offer. If no Event of Default has occurred and is continuing and subject to the provisions of Article XII hereof, the Holders representing at least 66-2/3% of the Preferred Shares may direct the Trustee <u>to release from the lien</u> of this Indenture such Portfolio Collateral in accordance with the terms of the Offer in each case against receipt of payment therefor.  (Emphasis added.)

83.     Section 10.3(d) of the Indenture does not contain any provision for the sale of Portfolio Collateral.  It merely permits 66-2/3% of the Preferred Shareholders to direct the Trustee to release the lien of the Indenture on assets that are sold pursuant to an Offer to which the Issuer and Trustee are capable of agreeing and to which they have affirmatively agreed (*i.e.*, such section merely ensures that a minority of preferred shareholders cannot veto the acceptance of an Offer at a fair value which would otherwise be accepted by the Issuer or Trustee).

84.     The underlying rationale of Section 10.3(d) is that Preferred Shareholders are the first to take losses under the Indenture and therefore should have a method for raising objections to grossly insufficient offers.  However, Section 10.3(d) of the Indenture does not, and cannot, delegate to the Preferred Shareholders the power to approve asset sales as it is the obligation of the Issuer, its directors and the Trustee to determine, consistent with their contractual and fiduciary duties, whether an Offer is in the best interests of the Issuer and its creditors as a whole.

Any acceptance of an Offer based on the mere consent of 66-2/3% of the Preferred Shareholders to release the lien would be a breach of the duties of the Issuer, its directors and the Trustee.

85.     Additionally, the fact that Section 10.3(d) does not contemplate "sale" of Portfolio Collateral, but only the release of liens to which the Portfolio Collateral is subject, is highlighted by the absence of the word "sell" or "sale" from Section 10.3(d), in contrast to other sections, which use those words when a sale of Portfolio Collateral is contemplated (*e.g.*, §§ 5.5(a), 5.18(a), 7.8(a)(1), 7.8(c), 9.10(b)(iii), 10.3(b), 12.2).

86.     Once a lien on Portfolio Collateral has been released under Section 10.3(d) in connection with a viable Offer to purchase Portfolio Collateral that is acceptable to the Issuers and Trustee, Section 12.2 of the Indenture may come into play.  Section 12.2, which is entitled "Sale of Portfolio Collateral Subject to Offer or Call,"  provides:  "Holders representing at least 66-2/3% of the Preferred Shares may direct the Trustee to sell an item of Portfolio Collateral that is the subject of an Offer or call for redemption, if, together with its direction to sell such security, such Holders certify to the Trustee that the sales price for such Security is equal to or greater than the price available pursuant to such Offer or call and such sale will be treated as if the Offer or call were consummated for purposes of determining the Collections for the Due Period relating to the date on which such sale occurs."

87.     Thus, where Portfolio Collateral is the subject of an Offer that otherwise would be acceptable to the Issuers and Trustee acting for the benefit of the CDO's creditors, Section 12.2 creates an incentive for Preferred Shareholders to seek out a buyer for the Portfolio Collateral at a higher price than the price of an Offer.  In this way, Section 12.2 increases the likelihood that Portfolio Collateral could be sold at a price that would generate dividends to the Preferred Shareholders after the Noteholders receive all amounts due them from the sale proceeds.

**The Brogno Offer**

88.     On July 25, 2014, Brogno sent a letter to the Issuers and Trustee of Tropic IV, offering to purchase $5 million face amount of the trust securities issued by Optimum Bank Holdings Capital Trust I (the "Portfolio Collateral") which was being held for the benefit of Noteholders.  Brogno set $500,000 as the purchase price for the Collateral, and offered an additional $250,000 bribe to Preferred Shareholders for a "direction" to the Issuers and Trustee to accept Brogno's Offer.  The Brogno Offer reflected Brogno's erroneous position that a supermajority (66-2/3%) of Preferred Shareholders is able to direct the CDO to accept the Offer.

89.     Subsequent to its receipt of the Brogno Offer, the Trustee forwarded to Preferred Shareholders a copy of the Brogno Offer letter along with a Notice of Offer and Request for Direction (the "Notice of Offer").  The Trustee also sent copies of this correspondence to the Montrose Entities and, upon information and belief, the other Tropic IV Noteholders.  Several Noteholder objections followed.

90.     At the time that the Trustee sent out the Notice of Offer, the Trustee was acting at the request of Brogno and was not acting on behalf of the Issuers.  The Issuers did not instruct the Trustee to send the Notice of Offer, and they gave the Trustee no indication that they desired to have any liens on the subject Portfolio Collateral released.  Neither the Issuers nor Trustee had yet even evaluated the Brogno Offer, much less determined, consistent with their contractual and fiduciary obligations to Noteholders, that it was in the CDO's interest to accept them.  Nor had the Issuers investigated the creditworthiness of Brogno or the bona fides of the Offers.

91.     Among other things, the Trustee indicated in the Notice of Offer that, pursuant to Section 10.3(d) of the Indentures, the Trustee would accept the Brogno Offer if a supermajority (66-2/3%) of the Preferred Shareholders directed the Trustee to release from the lien of the

Indenture the Collateral subject to the Offer.  No such direction was given prior to expiration of the Brogno Offer on October 23, 2014.

**The WMH Direction**

92.    On October 14, 2014, Interpleader Defendant WMH – as holder of more than 66 2/3% of the Tropic IV Preferred Shares, sent a letter directing the Trustee to sell the Portfolio Collateral to Gubin or his designee.

93.    The October 14, 2014 Letter purported to issue its direction under Section 12.2 of the Indenture, and certified that the Gubin purchase price was higher than the Brogno Offer price.  Thus, the Brogno Offer formed the predicate for the WMH direction under Section 12.2, even though the Brogno Offer was not viable, and was not evaluated by the Trustee or Issuers in the exercise of their duties to creditors.

94.    WMH has not rescinded its direction under Section 12.2 of the Indenture even though the Brogno Offer has since expired.

95.    On information and belief, Tropic IV is currently insolvent or is on the verge of insolvency, as reflected by (among other things) the fact that its debt securities are being traded at a steep discount.  A sale of the Portfolio Collateral to Gubin pursuant to the WMH direction would result in or exacerbate the insolvency of Tropic IV.

**The Instant Action**

96.    On December 11, 2014, the Trustee filed the instant Complaint seeking a determination of the parties' respective rights to the Portfolio Collateral.

97.    In addition to answering the Complaint, the Montrose Entities herein have filed their Counterclaims against the Trustee and Third Party Claims against the Issuers, as well as

Crossclaims against WMH and Gubin.  The Montrose Entities' claims are based on the plain

language of the Indenture, which cannot be read in a manner that:

- usurps the power of the Issuers and Trustee to accept or reject offers on Collateral the Issuers alone own and hold, and must protect consistent with their contractual and fiduciary obligations;

- vitiates the economic logic, structure and value of the CDOs; and

- produces a result that permits a third party to obtain, for pennies on the dollar, securities that stand as collateral for the Senior Notes.

## CLAIM I

### Crossclaim against WMH and Gubin

### Counterclaim against the Trustee

**(Declaratory Judgment)**

98.     The Montrose Entities repeat and reallege and incorporate by reference the

foregoing allegations as if fully set forth herein.

99.     As a predicate for directing a sale of Portfolio Collateral under Section 12.2, the

Indenture requires that there be a viable, lower Offer for purchase of that Collateral.

100.     Section 3.2(b) of the Indenture certifies that the Issuers are the owners of the

Portfolio Collateral.  Any Offer to purchase Portfolio Collateral must therefore be made to the

Issuers pursuant to the definition of "Offer" set forth in Section 1.1 of the Indenture.  Section 1.1

requires any Offer for collateral to be made to the "Holders" of the securities comprising the

collateral.

101.     There is no provision in the Indenture that confers on anyone other than the

Issuers and the Trustee the right to sell Portfolio Collateral in response to an Offer.

22

102.     Section 10.3(d) of the Indenture confers no such right on the Preferred Shareholders.

103.     The Brogno Offer was not made to the Issuers or Trustee.

104.     The Brogno Offer was not viable since it could not be accepted by the Issuers or Trustee in the exercise of their fiduciary or contractual duties and consistent with the negative covenant set forth in § 7.8 of the Indenture.

105.     The positions taken by the Trustee, WMH and Gubin demonstrate that there is an actual and justiciable controversy as to whether Brogno's Offer can be a predicate for WMH's direction to sell Portfolio Collateral under Section 12.2.

106.     Accordingly, the Montrose Entities seek a declaration that, under the terms of the Indenture, the Preferred Shareholders are not authorized to direct a sale of the Portfolio Collateral.

## CLAIM II

### Counterclaim against the Trustee

### Third-Party Claim against the Issuers

### (In the Alternative, Reformation)

107.     The Montrose Entities repeat and reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

108.     It is the Montrose Entities' position that Section 12.2 of the Indenture plainly and unambiguously authorizes a supermajority of the Preferred Shareholders to direct the sale of Portfolio Collateral only when there is a lower, viable Offer that would be acceptable to the Issuers or Trustee in the exercise of their contractual and fiduciary obligations and consistent

with the negative covenant set forth in § 7.8 of the Indenture, and when acceptance of that lower Offer has not been vetoed in accordance with Section 10.3(d).

109.    If the Court were to disagree with this reading of Sections 10.3(d) and 12.2 and find that the language of those sections grants Preferred Shareholders greater or different rights to direct the sale of Portfolio Collateral, then the Indenture does not reflect the contracting parties' clear and unmistakable intent and is the product of mutual mistake of the parties.

110.    The parties intended the pools of Portfolio Collateral to be static, to be maintained by the Trustee for the benefit of Noteholders, and to be sold only by the Issuers or Trustee in the exercise of their contractual and fiduciary obligations and consistent with the negative covenant set forth in § 7.8 of the Indenture.

111.    It was the understanding of the parties that the Portfolio Collateral would consist of illiquid investments, with no actively traded market, and that the CDO was established as, and would continue to be, a static vehicle with no active management of Collateral.  The parties understood that no Portfolio Collateral would be sold, except under circumstances which are not present here.

112.    It was never understood by the parties that the Preferred Shareholders, who hold the junior-most interest in the CDOs, could direct the sale of Portfolio Collateral in the circumstances present here.

113.    There was no disclosure to the Montrose Entities or any other Noteholder that a supermajority of Preferred Shareholders could direct the sale of Portfolio Collateral in the circumstances present here.

114. Any Indenture language that the Court might find authorizes a supermajority of Preferred Shareholders to direct the sale of Portfolio Collateral in the circumstances present here is a product of mutual mistake.

115. The Montrose Entities have no adequate remedy at law.

116. Accordingly, if the Court were to construe the Indenture as permitting WMH to direct the sale of Portfolio Collateral to Gubin or his designee, the Montrose Entities seek an Order reforming the Indenture to clarify that no such right exists.

## CLAIM III

### Crossclaim against WMH and Gubin

### Counterclaim against the Trustee

**(Declaratory Judgment)**

117. The Montrose Entities repeat and reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

118. Brogno's Offer to purchase Portfolio Collateral expired on October 23, 2014.

119. The Issuers or Trustee did not accept the Offer by October 23, 2014, and Brogno has not extended the deadline.

120. Even assuming, *arguendo*, that the Preferred Shareholders were legally authorized to direct the sale of Portfolio Collateral at the time of the Offer, WMH may not do so now, after the Offer's expiration.

121. The positions taken by the Trustee, WMH and Gubin demonstrate that there is an actual and justiciable controversy as to whether the sale of Portfolio Collateral to Gubin or his designee can be directed.

122.    Accordingly, the Montrose Entities seek a declaration that because Brogno's Offer for the Portfolio Collateral has expired, and was not accepted prior to its expiration and is no longer capable of being accepted, no sale can be directed under Section 12.2 of the Indenture.

<u>**CLAIM IV**</u>

<u>**Crossclaim against WMH and Gubin**</u>

<u>**Counterclaim against the Trustee**</u>

**(Declaratory Judgment)**

123.    The Montrose Entities repeat and reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

124.    DCL § 273 provides that "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."  DCL § 273 (McKinney 2015).

125.    Were the Portfolio Collateral to be sold to Gubin or his designee as directed by WMH, such conveyance would be fraudulent within the meaning of DCL § 273.

126.    Tropic IV is insolvent or would be rendered insolvent as a result of the sale of the Portfolio Collateral to Gubin or his designee.

127.    The sale of the Portfolio Collateral to Gubin or his designee as directed by WMH, would be without fair consideration.

128.    As senior creditors of Tropic IV, the Montrose Entities have standing to assert a claim under DCL §273.

129.    The positions taken by the Trustee, WMH and Gubin demonstrate that there is an actual and justiciable controversy as to whether the sale may be directed.

130.    Accordingly, the Montrose Entities seek a declaration that WMH's direction to sell the Portfolio Collateral to Gubin or his designee may not be followed because a sale would violate DCL § 273.

**CLAIM V**

**Crossclaim against WMH and Gubin**

**(For Tortious Interference with Contractual Relations)**

131.    The Montrose Entities repeat and reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

132.    In their capacity as Noteholders in the Tropic IV CDO, the Montrose Entities have contractual relations with the Trustee and Issuers, as set forth in the Indenture.

133.    WMH and Gubin had knowledge of the foregoing contractual relations.

134.    WMH and Gubin have disrupted the contractual relations between the Montrose Entities (and other Noteholders), on the one hand, and the Trustee and the Issuers, on the other. Upon information and belief, WMH and Gubin have entered into a secret arrangement as an inducement for WMH to direct the sale of Portfolio Collateral to Gubin or his designee for a fraction of its value. Through this secret arrangement, WMH and Gubin are seeking to exploit recent market conditions in which the Preferred Shareholders can no longer expect profit from the income generated by the underlying securities of the CDO.

135.    In the event that the Portfolio Collateral is sold to Gubin or his designee as directed by WMH, the willful and wrongful acts of WMH and Gubin will have caused the Trustee and/or Issuers of Tropic IV to breach the Indentures. But for those willful and wrongful acts, no such breach would occur.

136.    The willful and wrongful acts of WMH and Gubin have caused actual damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the Montrose Entities respectfully request a judgment:

(a)    Declaring that Preferred Shareholders do not have the power to direct a sale of the Portfolio Collateral under the terms of the Indenture (Claim I);

(b)    In the alternative, reforming the Indenture to reflect the intent of the contracting parties by clarifying that the Preferred Shareholders do not have the power to direct a sale of the Portfolio Collateral (Claim II);

(c)    Declaring that because Brogno's Offer for the Portfolio Collateral of Tropic IV has expired, and was not accepted prior to its expiration and is no longer capable of being accepted, a supermajority of the Preferred Shareholders are not authorized to direct the sale of Portfolio Collateral (Claim III);

(d)    Declaring that the Portfolio Collateral may not be sold to Gubin or his designee as directed by WMH because a sale pursuant to that direction would violate N.Y. Debtor Creditor Law § 273 (Claim IV);

(e)    Awarding Noteholders damages on Claim V in an amount to be determined at trial;

(f)    Awarding the Montrose Entities their attorneys' fees, costs and disbursements incurred herein and such other, further and different relief as this Court deems just and proper.

Dated:  March 5, 2015

Respectfully submitted,

JOSEPH HAGE AARONSON LLC


_/s/ Gregory P. Joseph_

Gregory P. Joseph (GJ-1210)
Peter R. Jerdee (PJ-1240)
Honey L. Kober (HK-1260)
485 Lexington Avenue, 30th Floor
New York, NY 10017
Telephone:  (212) 407-1200
Fax:  (212) 407-1280

*Attorneys for Interpleader Defendant Eton Park Capital Management, L.P., and Interpleader Defendants and Crossclaimants, Counterclaimants and Third-Party Plaintiffs Montrose Credit I, LLC, Montrose Credit II, LLC, Montrose Credit III, LLC, and Montrose Credit IV, LLC*

760723