UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                 :

WELLS FARGO BANK, N.A., *as Trustee*,     :

                    Plaintiff,    :

                   -v-            :

WRIGHTS MILL HOLDINGS, LLC; ETON PARK  :
CAPITAL MANGEMENT; MONTROSE CREDIT I,  :
LLC; MONTROSE CREDIT II, LLC; MONTROSE  :
CREDIT III, LLC; MONTROSE CREDIT IV, LLC;  :
WATERFALL ASSET MANAGEMENT; MOISHE  :
GUBIN; and CEDE & CO.,  :

                 Defendants.    :

                                   :
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/31/2015

14 Civ. 9783 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

    At issue in this interpleader action is whether Wells Fargo Bank, N.A. ("Wells Fargo"),

the Trustee responsible for the assets held in a collateralized debt obligation ("CDO"), is obliged,

under the terms of the indenture under which the CDO was formed, to sell particular collateral.

Under the relevant indenture provision, so long as there is a valid first offer to buy collateral of

the CDO, the CDO's most junior stakeholders (the "Preferred Shareholders") are empowered to

decide, by a two-thirds vote among them, whether to approve the sale of that collateral pursuant

to a *second* and higher offer.  The Preferred Shareholders have that authority even though they

are, by now, all but certain to be unaffected by the sale of any asset: The CDO's value has

dropped so precipitously from its inception that only the holders of top-priority security interests

(the "Noteholders") are likely to recover any payouts.

    The Preferred Shareholders have approved a sale of certain collateral here, in response to

a second offer.  The decisive issue is whether the unusual first offer for that collateral was valid.

To induce the Preferred Shareholders to approve the sale of particular collateral, the entity that made the first offer included, in addition to a $500,000 payment for the collateral, a separate $250,000 side payment to be kept by the Preferred Shareholders.  The Noteholders describe this $250,000 side payment as a "bribe," and as upending the CDO's payout structure.  They argue that the first offer was therefore invalid, and thus could not trigger the indenture provision that empowers the Preferred Shareholders to approve a second, superior offer.  However, the second offeror disputes the point.  It has demanded that Wells Fargo, as Trustee, approve its offer.

Wells Fargo brought this interpleader action to resolve this dispute.  Several parties have now moved for judgment on the pleadings.  For the reasons that follow, the Court holds that the first offer to buy the collateral was not valid, and that Wells Fargo therefore is not required (or authorized) to sell the collateral in question in response to the second offer.

## I.    Background

### A.    Factual Background[1]

#### 1.    The CDO and the Indenture

The Tropic IV CDO (hereinafter, the "CDO") is a CDO issued by Tropic IV CDO Ltd. (the "Issuer") and Tropic IV CDO Corp. (together with the Issuer, the "Co-Issuers").  Compl. ¶ 1; Montrose Ans. ¶ 67.  By a confidential offering circular dated November 12, 2004 (the

---

[1] The Court's account of the facts of this case is derived from the pleadings, which form the basis for the parties' pending motions.  These include Wells Fargo's Complaint, Dkt. 1 ("Compl."); Cede's Answer. Dkt. 14 ("Cede Ans."); Gubin's Answer, Dkt. 21 ("Gubin Ans."); Montrose's Answer, Dkt. 30 ("Montrose Ans."); Waterfall's Answer, Dkt. 32 ("Waterfall Ans."); Cede's Answer to Gubin's crossclaims, Dkt. 43; Montrose's Answer to Gubin's crossclaims, Dkt. 44; Gubin's Answer to Montrose's crossclaims, Dkt. 45; Waterfall's Answer to Gubin's crossclaims, Dkt. 48; Wells Fargo's Answer to Gubin's counterclaims, Dkt. 51; Wells Fargo's Answer to Montrose's counterclaims, Dkt. 52; Wells Fargo's Answer to Waterfall's counterclaims, Dkt. 53; and Gubin Answer to Waterfall's crossclaims, Dkt. 88.  Several of these pleadings also attach, and incorporate, the Indenture.  *See, e.g.*, Dkt. 45, Ex. A.

"Offering Circular"), the Co-Issuers offered for sale a series of six classes of Notes with an aggregate principal balance of $318.5 million (the "Notes") to investors, with the Notes to be secured by a portfolio of fixed income assets (the "Portfolio Collateral"). Indenture § 2.2; Waterfall Ans. ¶ 50. The Notes were issued pursuant to an indenture dated November 18, 2004 (the "Indenture") that granted Wells Fargo, as Trustee, a first priority security interest in all right, title, and interest in the Portfolio Collateral and other related assets. *See* Indenture, Granting Clause. Also on or about November 18, 2004, the Issuer issued 27 million Preferred Shares in the Issuer. *Id.* § 1.1.

Wells Fargo has at all times acted as Trustee for the CDO. *See* Indenture; Compl. ¶ 18. In that capacity, Wells Fargo holds the Portfolio Collateral, collects the proceeds payable on the Portfolio Collateral, and distributes those proceeds to Noteholders pursuant to the priority of payments, or "waterfall," described in the Offering Circular and the Indenture. Compl. ¶ 18.

The Notes are divided into six different tranches, or risk classes. Indenture § 2.2; Waterfall Ans. ¶ 50. The Indenture affords holders of the senior tranches of notes, or "Class A" notes, the highest priority to receive (1) principal and interest from the Portfolio Collateral, (2) the proceeds from sales of the Portfolio Collateral, and (3) the greatest protections against losses. Waterfall Ans. ¶ 50. By contrast, the Preferred Shareholders have no security interest in the Portfolio Collateral and have the lowest priority interest in the Portfolio Collateral. Indenture §§ 11.1(c), (d). As Judge Nathan has aptly explained in a ruling in a case arising under the same indenture, Preferred Shareholders "hold only equity in the CDO, are at the bottom of the 'waterfall' of payments, and thus are the first to bear any losses if the underlying assets fail to perform." *Hildene Capital Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc.*, No. 11 Civ. 5832 (AJN), 2012 WL 3542196, at *1 (S.D.N.Y. Aug. 15, 2012).

In this case, it is alleged that the CDO's underlying assets have, catastrophically, failed to perform.  Given the waterfall sequence under which investors are paid, the last-in-line Preferred Shareholders will therefore almost certainly never receive payouts.  *See, e.g.*, Montrose Ans. ¶ 95; Dkt. 100 ("4/24/2015 Tr."), 31 (the preferred shareholders "have . . . no expectation of recovery from selling these assets"); *id.* 34 ("[T]hese preferred shareholders . . . have no stake in the Trust."); *id.* 39–40 (preferred shareholders are out of the money).  Realistically, they therefore have no economic stake in the price at which assets of the CDO, if sold, are sold.

Under the Indenture, however, the Preferred Shareholders have authority, at least under certain circumstances, to approve the sale of portfolio collateral.  Three Indenture provisions are relevant here.

First, and most relevant, § 12.2 addresses the circumstance in which a successive offer is made for collateral that is the subject of a pending offer:

> Holders representing at least 66-2/3% of the Preferred Shares may direct the Trustee to sell an item of Portfolio Collateral that is the subject of an Offer or call for redemption, if, together with its direction to sell such security, such Holders certify to the Trustee that the sales price for such Security is equal to or greater than the price available pursuant to such Offer or call . . . .

Indenture § 12.2 (entitled "Sale of Portfolio Collateral Subject to Offer or Call").  In other words, two-thirds of the Preferred Shareholders may direct the Trustee to sell an item of portfolio collateral if there are two offers for that asset and they certify that the second offer is equal to or greater than the first offer.  The Preferred Shareholders therefore approve the sale, and the Trustee executes it.  Judge Nathan has held this provision unambiguous as a matter of law, *see Hildene Capital Mgmt.*, 2012 WL 3542196, at *5–6, and this Court joins in that conclusion.

Second, § 10.3(d) addresses the circumstance in which an offer has been made, in the first instance, for collateral:

> The Trustee on behalf of the Issuer shall notify the Holders of the Preferred Shares of any Portfolio Collateral that is subject to an Offer.  If no Event of Default has occurred and is continuing and subject to the provisions of Article XII hereof, the Holders representing at least 66-2/3% of the Preferred Shares may direct the Trustee to release from the lien of this Indenture such Portfolio Collateral in accordance with the terms of the Offer in each case against receipt of payment therefor.

Indenture § 10.3(d).  Judge Nathan considered this provision in *Hildene*.  She held § 10.3(d) ambiguous as a matter of law, in that it can be read to confer power on the Preferred Shareholders either (1) to authorize a sale of collateral or (2) to veto such a sale, while noting that the provision's language is an unusual way to formulate either concept.  *See* 2012 WL 3542196, at *5–6 & n.5.  In light of Judge Nathan's persuasive analysis in *Hildene*, it is not clear whether Preferred Shareholders have the authority to direct the sale of Portfolio Collateral in the context of a single purchase offer.  But, because § 12.2 is unambiguous, Preferred Shareholders may authorize the sale of Portfolio Collateral by approving the second, if higher, of two such offers.

Third, § 8.1 provides that the Trustee and the Co-Issuers may, at any time, supplement and amend the Indenture to, *inter alia*, "cure any ambiguity, or to correct, modify or supplement any provision which is defective or inconsistent with any other provision" in the Indenture, so long as the amendment does not adversely and materially affect "the interests of any Noteholder."  Indenture § 8.1(6).  The Trustee and the Co-Issuers may similarly, at any time, supplement and amend the Indenture to "correct any manifest error."  *Id.* § 8.1(8).

Significantly, at all relevant times, a single entity held more than two-thirds of the preferred shares: interpleader defendant Wrights Mill Holdings ("WMH"), which held 67.22% of the preferred shares.  Compl. ¶ 6.

### 2.      The Brogno Offer

On July 25, 2014, Wells Fargo received a letter from Brogno, LLC ("Brogno") offering to buy an item of Portfolio Collateral ("the Security") for a purchase price of $500,000.  The Security consists of $5 million of trust preferred securities.[2]  *See* Dkt. 134, Ex. 2.  At the same time, Brogno offered a "consent payment" of up to $250,000—which the Court refers to here as a "side payment"—to those Preferred Shareholders who directed the Trustee to accept its offer. *Id.*  The letter in which Brogno made those offers (the "Brogno Letter") attached two exhibits to facilitate the Preferred Shareholders' directing the Trustee to accept the offer: a "Direction" and a "Beneficial Owner Certification" form.  *Id.*  The Brogno Letter invited the Preferred Shareholders to "ACCEPT THE OFFER BY EXECUTING THE ATTACHED DIRECTION FORM AND RETURNING IT PROMPTLY TO [the Trustee and Brogno]."  *Id.*  The Brogno Letter closed by informing the Preferred Shareholders of their right, under § 12.2, to approve a sale of the Security to a follow-on bidder whose bid was equal to, or greater than, Brogno's bid. *Id.*

Wells Fargo caused copies of the Brogno offer to be delivered to, among others, the Preferred Shareholders.  *Id.*  Two interpleader defendants then notified Wells Fargo that they objected to the offer.  They claimed that acceptance of the offer would be improper and would violate their rights.  Compl. ¶¶ 26–28.  Brogno's offer expired on October 23, 2014, without being accepted.  Montrose Ans. ¶ 53.

---

[2] The Security is a $5 million face value note issued by Optimum Bank Holdings Capital Trust I. *See* Montrose Ans. ¶ 88.  Moishe Gubin "is the Chairman of OptimumBank Holdings Inc., an affiliate of the issuer of the item of Portfolio Collateral at issue in this case."  Compl. ¶ 14.

### 3.    The Directive to Sell to Moishe Gubin

In a letter dated October 14, 2014—nine days before the expiration of Brogno's offer—WMH, citing § 12.2 of the Indenture, directed Wells Fargo to sell the Security to "Moishe Gubin or his designee" for $800,000.  Dkt. 112, Ex. D.  WMH's letter represented that Gubin had stated that he wished to buy the Security for that price, and to settle the transaction by October 23, 2014.  *Id.*  WMH's letter did not state how it had become aware of Gubin's offer.  Nor has WMH subsequently come forward with the writing in which Gubin had, purportedly, communicated his offer.

Two Noteholders or groups thereof—Waterfall Asset Management ("Waterfall") and the Montrose entities (hereinafter, "Montrose")[3]—thereupon wrote Wells Fargo.  They objected to Gubin's offer, claiming that accepting it would be improper and would violate their legal rights, and threatening to sue if it were accepted.  Compl. ¶¶ 33–38.  In response, WMH and Gubin wrote Wells Fargo, urging it to sell the Security to Gubin, *id.* ¶¶ 39–41; Gubin threatened to sue Wells Fargo if the sale to him did *not* go through, *id.* ¶ 40.

### B.    Procedural History

On December 11, 2014, Wells Fargo filed this interpleader action, seeking a resolution of its obligations and the various parties' rights to the disputed collateral.  *Id.* ¶¶ 1, 41.  Specifically, Wells Fargo seeks judicial guidance as to whether it is obligated and/or permitted to sell the assets to Gubin over the objection of the objecting Noteholders.  Wells Fargo interpled 10 defendants: (1) Brogno, the putative first offeror; (2) Gubin, the putative second offeror; (3) WMH, the holder of 67.22% of the Preferred Shares; (4) Cede & Co., "the registered

---

[3] These entities are Eton Capital Park Management; Montrose Credit I, LLC; Montrose Credit II, LLC; Montrose Credit III, LLC; and Montrose Credit IV, LLC.

Noteholder of record of the Notes at issue" in this case, *id.* ¶ 15, and a self-proclaimed "nominal party" only, Cede Ans. ¶ 4; (5) Waterfall, which has a first-priority interest in the assets at issue in this case; and (6–10) Montrose, five senior Noteholders whose interests, like Waterfall's, are higher in priority than those of the Preferred Shareholders.[4]

Of these various parties whom Wells Fargo interpled, two are now out of the case: WMH, which never appeared despite being served and which the Court has barred from further participation in this suit, Dkt. 104; and Brogno, whose offer expired and which the Court has dismissed, Dkt. 87. Further, defendant Cede & Co. is not participating in the present motions. As for Wells Fargo, it takes no position on the merits. *See* Compl. ¶ 43; Dkt. 153 ("6/19/2015 Tr."), at 60. That leaves three participating parties—Gubin, Montrose, and Waterfall—as the real parties in interest. Each filed counterclaims and crossclaims, seeking the following relief:

1. **Gubin** seeks a declaration that § 12.2 of the Indenture authorizes WMH to direct Wells Fargo to sell the security to him for $800,000, and an injunction requiring Wells Fargo to sell the security to him for $800,000. *See* Gubin Ans. ¶¶ 93, 97.

2. **Montrose** seeks a declaration that the Trustee cannot consummate a sale to Gubin because (1) the Preferred Shareholders are not authorized to direct a sale of securities, (2) § 12.2's requirements have not been met, and (3) the sale would be a fraudulent conveyance. In the alternative, Montrose seeks reformation of the Indenture to make it clear that Preferred Shareholders lack the power to direct such sales, as any such power would be a product of mutual mistake and contrary to the parties' understanding at the time the CDO was created; they also bring claims for fraudulent conveyance and tortious interference with contractual and business relations, alleging that a sale of the security to Gubin would constitute a fraudulent conveyance and would cause contractual breaches. *See* Montrose Ans. ¶¶ 57, 99.

3. **Waterfall** seeks a declaration that Preferred Shareholders are not authorized to direct the sale of Portfolio Collateral, as well as a declaration that no sale can

---

[4] Wells Fargo also interpled "Does 1 through 100, owners of beneficial interests in the Notes." Compl.; *see also id.* ¶ 16. But it later dismissed these still-unidentified defendants so as not to risk undermining diversity jurisdiction. *See* Dkt. 99; *see generally Howell v. Tribune Entm't Co.*, 106 F.3d 215, 218 (7th Cir. 1997).

> be directed under § 12.2 of the Indenture; but in the alternative, in the event that the Court finds the Indenture ambiguous as to whether Preferred Shareholders can direct sales of portfolio collateral, Waterfall seeks injunctive relief directing the Trustee to supplement the Indenture to conform it to the commercial bargain between the parties. *See* Waterfall Ans. ¶¶ 61, 95.

Thus, this is essentially a three-party dispute, though two parties (Montrose and Waterfall) take virtually identical positions.

On May 13, Montrose filed a motion for judgment on the pleadings, Dkt. 107, and a brief, Dkt. 108 ("Montrose Br."), and a declaration, Dkt. 109 ("Stanley Decl."), in support. The same day, Gubin filed a motion for judgment on the pleadings, Dkt. 110, as well as a brief, Dkt. 111 ("Gubin Br."), and an affidavit, Dkt. 112 ("Scholnick Aff."), in support. On May 20, 2015, the Court issued an order soliciting letter briefs as to the interpretation and possible applicability of § 10.3(d) of the Indenture, Dkt. 117; on May 27, 2015, Gubin and Montrose both filed their letters. Dkt. 126 ("Gubin 10.3 Letter"), 139 ("Montrose 10.3 Letter"). On June 3, 2015, Montrose filed a brief opposing Gubin's motion. Dkt. 132 ("Montrose Opp. Br."). The same day, Waterfall also filed a brief opposing Gubin's motion, Dkt. 133 ("Waterfall Opp. Br."), along with a declaration, Dkt. 134 ("Hanin Decl."). The same day, Gubin filed a brief opposing Montrose's motion. Dkt. 135 ("Gubin Opp. Br.").

On June 12, 2015, Gubin moved to strike 10 exhibits in Waterfall's declaration, Dkt. 144, and filed a brief in support, Dkt. 145 ("Gubin Strike Br."). On June 16, 2015, Waterfall filed a brief in opposition to Gubin's motion to strike. Dkt. 148 ("Waterfall Strike Opp."). The same day, the Trustee filed a brief opposing one argument that Montrose made in opposing Gubin's motion for judgment on the pleadings. Dkt. 147 ("Trustee Br."). On June 19, 2015, the Court held extended argument. *See* 6/19/2015 Tr.[5]

---

[5] Ten days after argument, Gubin submitted an unsolicited letter seeking to supplement his merits arguments, Dkt. 149; a few days later, Montrose submitted a reply, Dkt. 150. The Court

## II.   Analysis

The Court first addresses Gubin's motion to strike 10 exhibits in Waterfall's declaration, and then analyzes Gubin's and Montrose's competing motions for judgment on the pleadings.

### A.   Gubin's Motion to Strike Waterfall's Exhibits

Attached to Waterfall's submissions in opposition to Gubin's motion for judgment on the pleadings were 12 exhibits. *See* Dkt. 133–34. These provide, Waterfall asserts, documentary support for its allegation that Gubin, Brogno, and WMH have improperly colluded to strip the CDO of value for their private benefit. Specifically, Waterfall alleges, Brogno and Gubin made successive, and plainly inadequate, offers to purchase the Security, and induced WMH by means of the promise of monetary payments, to approve Gubin's second offer. *See, e.g.*, Waterfall Opp. Br. 8–9. Waterfall claims that there is "an elaborate network" of business and personal connections between Gubin, Brogno, and WMH. *Id.* at 9. It further asserts that material factual disputes remain as to "whether 'Gubin or his designee' are, in fact, purchasers separate and apart from Brogno." *Id.* at 17. It argues that a valid "§ 12.2 purchase" requires, *inter alia*, that the two offers have been from *separate* bidders. *Id.* at 19. Gubin counters that these 10 of these 12 exhibits should be stricken.

The 10 exhibits at issue in Waterfall's declaration are:

1. A printout obtained from the Illinois Secretary of State website, listing the managers of United RX, LLC.
2. A printout obtained from the Indiana Secretary of State website, concerning United RX, LLC.

---

disregards these letters in this decision because Gubin's letter improperly raises new arguments after the close of briefing and argument, without having sought or obtained permission for such a submission. *See Direxion Shares, ETF Trust v. Leveraged Innovations L.L.C.*, No. 14 Civ. 1777 (KBF), 2014 WL 6469084, at *1 n.2 (S.D.N.Y. Nov. 18, 2014) (disregarding "submission without permission and after all briefing had been submitted and oral argument on the motion had occurred"). In any event, having reviewed these letters, they would not disturb the Court's analysis or holdings here.

3. Records obtained from the Indiana Secretary of State website, concerning New Boys Management.
4. A document titled "Midwest Torah Center, The Torah Telegraph," available on Midwest Torah's website.
5. A printout of records obtained from the Indiana Secretary of State website, concerning the Midwest Torah Center.
6. Search results obtained from a LexisNexis database for businesses associated with Moishe Gubin.
7. A printout from the Medicare.gov website, which states it is the official U.S. Government website for Medicare, providing ownership information for the Blossom North Nursing and Rehabilitation Center.
8. A printout from the website www.evansteamny.com/BoardofDirectors.aspx, for "Evan's Team" charity, showing its Board of Directors.
9. A printout from the Medicare.gov website, which states it is the official U.S. Government website for Medicare, providing ownership information for the Batavia Health Care Center.
10. Property records obtained from the Westchester County clerk's website, for 16 Wrights Mill Road, Armonk, NY, 10504.

Hanin Decl., Exs. 3–12; *see also* Gubin Strike Br.

### 1.      Applicable Legal Standards

Under Federal Rule of Evidence 201, a court may take judicial notice, at "any stage of the proceeding," of any fact "that is not subject to reasonable dispute because" it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2), (d).  When considering a Rule 12(b)(6) or Rule 12(c) motion, the Court may take judicial notice of certain matters of public record without converting the motion into one for summary judgment.  *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 426 (2d Cir. 2008) ("[M]atters judicially noticed by the District Court are not considered matters outside the pleadings.") (citing 5 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Pro. § 1366 & n.33 (3d ed. 2004));

*Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (court may "take judicial notice of the contents of relevant public disclosure documents . . . as facts 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned'").

Pursuant to Rule 201, courts have considered newspaper articles, documents publicly filed with the SEC or FINRA, documents filed with a Secretary of State, documents filed with governmental entities and available on their official websites, and information publicly announced on certain non-governmental websites, such as a party's official website. *See, e.g.*, *N.J. Carpenters Health Fund v. Royal Bank of Scot. Group, PLC*, 709 F.3d 109, 126–27 & n.11 (2d Cir. 2013) (newspaper articles); *Forgione v. Gaglio*, No. 13 Civ. 9061 (KPF), 2015 WL 718270, at *17 (S.D.N.Y. Feb. 13, 2015) (FINRA filings); *Chevron Corp. v. Salazar*, 807 F. Supp. 2d 189, 193 n.5 (S.D.N.Y. 2011) (merger agreement filed with Delaware Secretary of State); *Am. Cas. Co. of Reading, PA v. Lee Brands, Inc.*, No. 05 Civ. 6701 (SCR), 2010 WL 743839, at *4 (S.D.N.Y. Mar. 3, 2010) (corporate certificate of dissolution filed with California Secretary of State); *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) ("For purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'").

### 2.    Application

As to the seven documents retrieved from official government websites—to wit, the Illinois Secretary of State, the Indiana Secretary of State, Medicare.gov, and the Westchester County clerk—it is clearly proper to take judicial notice.  Courts routinely take judicial notice of such governmental records.  *See, e.g.*, *Lee Brands, Inc.*, 2010 WL 743839, at *4 (corporate certificate of dissolution filed with California Secretary of State); *Salazar*, 807 F. Supp. 2d at 193

n.5 (merger agreement filed with Delaware Secretary of State); *Big E. Entm't, Inc. v. Zomba Enters., Inc.*, 453 F. Supp. 2d 788, 797 (S.D.N.Y. 2006) (judicial notice of lack of a required filing with the New York Secretary of State), *aff'd*, 259 F. App'x 413 (2d Cir. 2008) (summary order); *Coleman & Co. Sec. v. Giaquinto Family Trust*, 236 F. Supp. 2d 288, 308–09 (S.D.N.Y. 2002) (records in SEC database).  Accordingly, the Court denies Gubin's motion to strike as to these seven exhibits.

As to the remaining three documents:  With respect to the LexisNexis database search, it is publicly available, and case law supports taking judicial notice of it.  *See, e.g.*, *Sterling v. Interlake Indus. Inc.*, 154 F.R.D. 579, 586 (E.D.N.Y. 1994) ("[T]he Court takes judicial notice that a five minute exercise on the NEXIS database, or a review of Standard & Poor's Corporate Descriptions, would disclose, in detail, not only every subsidiary of Interlake and the relationship of Interlake to Redirack, but also that Redirack had merged into Acme Strapping Inc."); *Vox Amplification Ltd. v. Meussdorffer*, No. 13 Civ. 4922 (ADS) (GRB), 2014 WL 558866, at *8 (E.D.N.Y. Feb. 11, 2014), *report and recommendation adopted*, 50 F. Supp. 3d 355 (E.D.N.Y. 2014) ("Furthermore, based upon independent web searches, I take judicial notice that, as I had recalled, there are scores of stringed instruments featuring teardrop bodies . . . .") (citing *United States v. Bari*, 599 F.3d 176, 180 (2d Cir. 2010) (upholding judicial notice in a criminal case, noting "a judge need only take a few moments to confirm his intuition by conducting a basic Internet search")).

With respect to the final two documents—printouts from entities' websites—the case law applying Rule 201 states that, "[f]or purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'"  *Doron*

*Precision Sys.*, 423 F. Supp. 2d at 179 n.8; *accord Sarl Louis Feraud Int'l v. Viewfinder Inc.*, 406 F. Supp. 2d 274, 277 (S.D.N.Y. 2005) ("[A]ll of the facts relevant to the resolution of the matter are contained either in the complaint, or in materials (such as the records of the French proceedings or the defendant's websites) that are either referred to in the complaint or of which the Court may take judicial notice."), *vacated and remanded on other grounds*, 489 F.3d 474 (2d Cir. 2007).  Here, Gubin does not actually dispute the factual material reflected in these websites. He simply would prefer that the Court not consider these materials.

As a result, given the case law and the lack of any concrete dispute as to the accuracy of the materials at issue, the Court denies Gubin's motion to strike in its entirety.[6]

### B.      Cross-Motions for Judgment on the Pleadings

#### 1.      Legal Standard for Motions for Judgment on the Pleadings

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." A motion for judgment on the pleadings is governed by "the same standard" as a motion to dismiss under Rule 12(b)(6).  *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (quoting *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009) (per curiam)); *accord L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011).  Thus, the Court accepts all of the non-movant's factual allegations as true and draws all reasonable inferences in the non-movant's favor.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

---

[6] Because the Court has resolved this dispute on a different ground than the one to which these documents relate, the Court's resolution of Gubin's motion to strike has had no impact at all on the decision here that Wells Fargo is not obliged under § 12.2 to sell the collateral in response to Gubin's purchase offer.

To survive a motion for judgment on the pleadings, a party must plead sufficient factual allegations "to state a claim for relief that is plausible on its face," *id.* at 570, meaning that the complaint must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Further, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  "A grant of a motion pursuant to Rule 12(c) is proper 'if, from the pleadings, the moving party is entitled to judgment as a matter of law.'"  *Dargahi v. Honda Lease Trust*, 370 F. App'x 172, 174 (2d Cir. 2010) (summary order) (quoting *Burns Int'l Sec. Servs., Inc. v. Int'l Union*, 47 F.3d 14, 16 (2d Cir. 1995) (per curiam)).

"On a 12(c) motion, the court considers 'the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case.'"  *L-7 Designs, Inc.*, 647 F.3d at 422 (quoting *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009)).  The Court may also review any document incorporated by reference in one of the pleadings.  *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004).  Finally, the Court may consider a document not specifically incorporated by reference but on which the complaint relies and which is integral to it.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

If the allegations of a pleading "are contradicted by documents made a part thereof, the document controls and the court need not accept as true the allegations of the [pleading]."  *Sazerac Co. v. Falk*, 861 F. Supp. 253, 257 (S.D.N.Y. 1994); *accord Feick v. Fleener*, 653 F.2d 69, 75 & n.4 (2d Cir. 1981).  Thus, a motion for judgment on the pleadings "can be particularly appropriate in breach of contract cases involving legal interpretations of the obligations of the parties."  *VoiceAge Corp. v. RealNetworks, Inc.*, 926 F. Supp. 2d 524, 529 (S.D.N.Y. 2013).

## 2.     Applicable Principles of New York Contract Law

Here, the Indenture is to be construed under New York law.  *See* Indenture, § 13.10(a).
Under New York law, the interpretation of an unambiguous contract is a question of law to be
addressed by the Court.  *See Provident Loan Soc'y of N.Y. v. 190 E. 72nd St. Corp.*, 911
N.Y.S.2d 308, 309 (1st Dep't 2010); *805 Third Ave. Co. v. M.W. Realty Assocs.*, 58 N.Y.2d 447,
451 (1983).  So too is the determination whether a contract provision is ambiguous.  *Eternity
Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004)
(citing *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)).  A contract is
ambiguous only if "the provisions in controversy are reasonably or fairly susceptible of different
interpretations or may have two or more different meanings."  G*oldman Sachs Grp., Inc. v.
Almah LLC*, 924 N.Y.S.2d 87, 90 (1st Dep't 2011) (internal citation and quotation marks
omitted); *see also Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 197 (2d Cir. 2005).  A
contract is not ambiguous simply because the parties ask the Court to construe it differently.  *See
Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010); *Mt.
Vernon Fire Ins. Co. v. Creative Hous. Ltd.*, 88 N.Y.2d 347, 352 (1996).

In determining the meaning of a contract, the Court "look[s] to all corners of the
document rather than view sentences or clauses in isolation."  *Int'l Klafter Co. v. Cont'l Cas.
Co.*, 869 F.2d 96, 99 (2d Cir. 1989) (citation and internal quotation marks omitted); *see also
Kass v. Kass*, 91 N.Y.2d 554, 566 (1998).  "[W]hen parties set down their agreement in a clear,
complete document, their writing should as a rule be enforced according to its terms."  *W.W.W.
Assocs., Inc.*, 77 N.Y.2d at 162.  In other words, the Court's "primary objective is to give effect
to the intent of the parties as revealed by the language they chose to use."  *Bolt Elec., Inc. v. City
of New York*, 223 F.3d 146, 150 (2d Cir. 2000).

### 3. Application

The Court first addresses whether Gubin has standing to enforce the Indenture, because Montrose argues that Gubin does not, being "a stranger to the contract" who has "no rights under the Indenture and no standing to enforce it." Montrose Br. 11. The Court then considers, on the merits, the cross-motions for judgment on the pleadings.

### i. Gubin's Standing

Under both federal and New York state law, challenges to standing must be raised in a party's answer or pre-answer motion to dismiss. Montrose did not do so here. Specifically, Montrose filed its Answer to Gubin's Crossclaims in March 2015 without asserting that Gubin lacked standing. *See* Dkt. 44, ¶¶ 50–51. Nor did Montrose raise standing during the April 24, 2015 pre-trial conference: On the contrary, Montrose's counsel—contrary to its present claim that WMH's default precludes Gubin from seeking an interpretation of the Indenture—asserted that Montrose has "no view on the existing default" as to WMH. 4/24/2015 Tr., 72.

By failing to plead the defense of standing and by making such an argument only after Gubin moved for judgment on the pleadings, Montrose thereby waived any argument that the Indenture's terms prevent Gubin from seeking an interpretation of the Indenture. As the Second Circuit held in a similar matter:

> [The issuer] appears to have waived the argument that the indenture does not give [the beneficial noteholder] standing to sue. [The issuer] did not raise the argument anywhere in its answer, and we are inclined to believe that an assertion of a party's incapacity to sue "should fall within the class of 'threshold defenses'—issues that must be raised and disposed of at the outset of the suit."

*Allan Applestein TTEE FBO D.C.A. v. Province of Buenos Aires*, 415 F.3d 242, 245 (2d Cir. 2005) (quoting 5A Wright & Miller, Fed. Prac. & Pro. § 1295 (3d ed. 2004)); *accord Wells Fargo Bank Minn., Nat'l Ass'n v. Mastropaolo*, 837 N.Y.S.2d 247, 248 (2d Dep't 2007)

(defense of lack of standing "is waived if not raised in an answer or in a pre-answer motion to dismiss the complaint"); *Wells Fargo Bank, N.A. v. Erobobo*, 127 A.D.3d 1176, 1177–78 (2d Dep't 2015) (same) (collecting cases).

In any event, even if Gubin's standing were subject to a timely and meritorious challenge, the Court would still reach the merits.  This interpleader action was brought by Wells Fargo, the indenture trustee, not Gubin.  Wells Fargo did so to clarify its obligations, in the face of the contrary claims with which it was presented as to whether or not it is obliged (or permitted) under the Indenture to sell the Security in response to Gubin's offer.  Whether or not Gubin affirmatively moved for relief in this proceeding, Wells Fargo would still need resolution as to its obligations.  The Court therefore proceeds to the merits of this dispute.

### ii.        The Merits of The Cross-Motions

The parties' cross-motions are largely, but not completely, mirror images.  Gubin seeks (1) a declaration that § 12.2 of the Indenture authorizes WMH to direct Wells Fargo to sell the Security to Gubin for $800,000; and (2) an injunction requiring Wells Fargo to sell the Security to Gubin for $800,000.  In short, Gubin takes the position that, under § 12.2, Wells Fargo, having been so directed by a two-thirds vote of the Preferred Shareholders, is obliged to sell him the Security.  In contrast, Montrose takes the position that, under § 12.2, Wells Fargo is not obliged or empowered to sell the Security, including on the ground that § 12.2 requires two separate valid offers, and the first offer here, Brogno's, was not valid.  Montrose also makes separate arguments.  It seeks, if needed, reformation of the Indenture.  And it claims that a sale to Gubin would be a fraudulent conveyance and tortiously interfere with its contractual and business relations.

To the extent that the parties' cross-motions address whether Wells Fargo has the duty or the power under § 12.2 to sell the Security to Gubin in light of the successive Brogno and Gubin purchase offers, the cross-motions are thus integrally interwoven. They are properly examined together. And because the Court resolves that question in the negative based on undisputed facts, there is no occasion to consider Montrose's separate arguments towards the same end.

Specifically, as explained below, the Court holds that Brogno's initial offer was on its face not a valid offer within the meaning of §12.2, containing as it did an overt side payment to the Preferred Shareholders to induce these shareholders to approve of a sale of CDO collateral. That offer by nature invited and induced the Preferred Shareholders to disregard their duties of good faith and fair dealing. And any construction of § 12.2—such as that propounded by Gubin—under which an offer embedding such a side payment to the decisionmaker would qualify as a valid first offer triggering § 12.2's successive-offer authority would therefore be commercially unreasonable.

Analysis begins with the Indenture's text. Section 12.2 provides that two-thirds of the Preferred Shareholders "may direct the Trustee to sell an item of Portfolio Collateral that is the subject of an Offer" if, together with their directive, the Preferred Shareholders "certify to the Trustee that the sales price for such Security is equal to or greater than the price available pursuant to such Offer." Thus, provided there is a pending "Offer" for a security, two-thirds of the Preferred Shareholders may direct the Trustee to sell that security if (1) there is then a *second* offer for that asset, and (2) the Preferred Shareholders certify that "the sales price" of the second offer is equal to or greater than the price available in the first offer.

The issue is whether a purchase offer such as Brogno's, given the side payment to the Preferred Shareholders embedded in it, qualifies as an "Offer." The Court first considers the

definition of "Offer" in the Indenture.  The Indenture defines "an Offer," in relevant part, as follows:  "With respect to any security, . . . any offer by . . . any . . . person made to all of the holders of such class of security to purchase or otherwise acquire all such securities."  Indenture, § 1.1.[7]  This definition is less than fully clarifying, in that it defines "Offer" by using the word "offer."  The Court therefore looks to the ordinary meaning of the term "offer," because, under New York contract law principles, words such as "offer" are to be given their ordinary meanings; New York courts commonly use dictionary definitions to determine such meanings.  *See, e.g., Mazzola v. Cty. of Suffolk*, 533 N.Y.S.2d 297, 297 (2d Dep't 1988) (citing *Allied Chem. Corp. v. Alpha Portland Indus.*, 397 N.Y.S.2d 480 (4th Dep't 1977)); *10 Elliott Square Court Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 120 (2d Cir. 2011) (citing, *inter alia*, *Mazzola* and relying on Black's Law Dictionary definition).

Black's Law Dictionary defines "offer" as "to present for acceptance or rejection," *see* http://thelawdictionary.org/offer/; Merriam-Webster's Dictionary defines "offer" as "the act of giving someone the opportunity to accept something" and "a presenting of something for acceptance," *see* http://www.merriam-webster.com/inter?dest=/dictionary/offer (both websites were last visited August 31, 2015).  Thus, the term "offer" necessarily implies something that is

---

[7] The full definition of "Offer" is:

> With respect to any security, (a) any offer by the issuer of such security or by any other person made to all of the holders of such class of security to purchase or otherwise acquire all such securities (other than pursuant to any redemption in accordance with the terms of the related Underlying Instruments) or to exchange such securities for any other security or other property or (b) any solicitation by the issuer of such security or any other Person to amend, modify or waive any provision of such security or any related Underlying Instrument.

Indenture, § 1.1.

capable of being accepted.  The case law is in accord.  *Cf., e.g.*, *Grp. One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048 (Fed. Cir. 2001) (holding that, in determining whether correspondence was an "offer" sufficient to satisfy phrase "subject of a commercial offer for sale," "Only an offer . . . which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale"), *cert. denied*, 534 U.S. 1127 (2002); *Elite Licensing, Inc. v. Thomas Plastics, Inc.*, 250 F. Supp. 2d 372, 389 n.20 (S.D.N.Y. 2003) (same).

The key question, then, is whether an offer like Brogno's was capable of acceptance.  Did the fact that Brogno's offer embedded a side payment intended to induce approval from the entity empowered to authorize the sale of CDO portfolio collateral make the offer invalid?

The Court holds that Brogno's offer was invalid and *not* capable of acceptance.  Simply put, the Preferred Shareholders could not approve Brogno's offer because accepting a side payment to exercise their authority to decide whether to approve a sale would blatantly breach their implied duty of good faith and fair dealing, owed to the other stakeholders in the CDO.  Under New York law, "[i]mplicit in every contract is a covenant of good faith and fair dealing" that "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Legend Autorama, Ltd. v. Audi of Am., Inc.*, 100 A.D.3d 714, 716 (2d Dep't 2012) (citations and internal quotation marks omitted).  "Even if a party is not in breach of its express contractual obligations, it may be in breach of the implied duty of good faith and fair dealing . . . when it exercises a contractual right as part of a scheme to realize gains that the contract implicitly denies or to deprive the other party of the fruit (or benefit) of its bargain."  *Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc.*, 97 A.D.3d 781, 784 (2d Dep't 2012) (citations and internal quotation marks

omitted).  And where "a contract confers decision-making power on a single party, the resulting

discretion is nevertheless subject to an obligation that it be exercised in good faith." *Travellers

Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994); *accord Carvel Corp.

v. Diversified Mgmt. Grp., Inc.*, 930 F.2d 228, 231 (2d Cir. 1991) (contractual discretion did not

relieve plaintiff of its duty to act in good faith); *see also Richbell Info. Servs., Inc. v. Jupiter

Partners, L.P.*, 309 A.D.2d 288, 303 (1st Dep't 2003) (denying motion to dismiss breach of

implied covenant claim where plaintiff "alleged that [defendant] invoked its veto power over the

IPO for an illegitimate purpose and in bad faith").

      These principles apply straightforwardly in this case.  Section 12.2 "confers decision-

making power on a single party," the Preferred Shareholders, but their "discretion is nevertheless

subject to an obligation that it be exercised in good faith." *Travellers Int'l, A.G.*, 41 F.3d at

1575.  For the Preferred Shareholders to accept $250,000 for approving a sale would flout their

duty to the other stakeholders in the CDO to make a good-faith decision, on the merits, as to

whether to sell particular collateral at a particular price.  The point is illustrated by assuming a

"low-ball" purchase offer for particular CDO collateral that a neutral decisionmaker would have

no reason to accept.  But for the side offer, the Preferred Shareholders would presumably not

accept such an offer.  But a large side payment like Brogno's, which rewards approval of an

offer but not its disapproval, profoundly realigns the Preferred Shareholders' incentives.  It gives

the Preferred Shareholders the proverbial 250,000 reasons to approve a sale, even if on the merits

the price offered by Brogno were objectively unreasonably low.

      While a side payment to the decisionmaker as to CDO asset sales would be problematic

under any circumstances, it is particularly so under these.  The Preferred Shareholders, all agree,

have no realistic prospect of realizing any recovery from the CDO.  They therefore have no "skin

in the game."  Where once their status as the entities on the lowest level of the payment waterfall

made them effective virtual representatives for the other stakeholders, because they had an

obvious interest in insisting on a fair sales price for CDO collateral, the Preferred Shareholders

no longer have any economic stake in that price.  The only force impelling them to drive a hard

bargain with a would-be buyer such as Brogno is their implied duty of good faith and dealing.

But if the buyer were permitted to offer a $250,000 side payment contingent on acceptance of his

purchase offer, that impulse to insist on a fair price might well be overcome by monetary self-

interest.

And the need for the decisionmaker to be conflict-free and rigorously independent is

particularly acute given the relative illiquidity of, and the complex and subjective valuation

process as to, many CDO assets.  Whether the sales price for particular CDO collateral is fair

may not be apparent on its face—the decisionmaker may need to take account of complex factors

and perhaps obtain expert guidance (*e.g.*, as to the relevant real-estate market) before making

that assessment.  Unlike in liquid markets involving transparent sales of like commodities, the

CDO's other stakeholders will not necessarily know that the price approved by the Preferred

Shareholders was reasonable.  This magnifies the potential for abuse—for approval by the

Preferred Shareholders of a sale at an unreasonably low price—where these shareholders are

monetarily incented to approve a sale.

The side payment embedded in Brogno's offer therefore cannot be squared with the

Preferred Shareholders' duty of fair dealing and duty to exercise their discretion in good faith.

Therefore, Brogno's offer could not have been accepted, and did not constitute an "Offer" within

the meaning of § 12.2.[8]  And because Brogno's first offer was not valid, there was no authority

under § 12.2 for Gubin's offer to be accepted as a second, superior offer.  Montrose's motion for

judgment on the pleadings is, therefore, meritorious, in that Wells Fargo lacks authority to accept

Gubin's offer under § 12.2.  And Gubin's motion for judgment on the pleadings correspondingly

must be denied.

    In any event, apart from the Court's construction of the term "Offer," to construe § 12.2

to recognize as a qualifying first offer an offer embedding a side payment to the decisionmaker

would yield a commercially unreasonable interpretation.  That is because doing so would upend

the payment structure of the CDO, by steering a portion of the buyer's aggregate payout to the

entities at the bottom of the payment waterfall, entities that otherwise stand, under the Indenture,

to recover no money.  The Preferred Shareholders have neither a security interest nor, by now, a

realistic beneficial interest in the CDO's collateral.  For them to receive $250,000 of the buyer's

aggregate purchase price would subvert the Indenture provisions that give the Noteholders

categorical priority over the Preferred Shareholders with respect to the fruits of collateral sales.

Section 5.10—entitled "Unconditional Rights of Noteholders to Receive Principal and

Interest"—grants Noteholders the "absolute and unconditional" right to receive the benefits of

---

[8] Where the facts fall short of establishing a contractual term, New York courts have enforced the literal requirements of such a term.  *See, e.g.*, *Zuckerberg v. Blue Cross & Blue Shield of Greater N.Y.*, 487 N.Y.S.2d 595, 598 (2d Dep't 1985) (appellate division reversed health-insurance-coverage ruling for plaintiff, which had been made on grounds that Hospital La Gloria was in substantial compliance with contractual definition of a hospital," on grounds that Hospital La Gloria did not "constitute[] a hospital in accordance with contractual definition" in insurance policy), *aff'd*, 67 N.Y.2d 688 (1986); *see also Erie Ins. Grp. v. Nat'l Grange Mut. Ins. Co.*, 883 N.Y.S.2d 601, 603 (3d Dep't 2009) (denying request for relief because insurance policy's definition of "additional insured" was not met); *cf. Process Am., Inc. v. Cynergy Holdings, LLC*, No. 12 Civ. 772 (BMC), 2014 WL 3844626, at *11 (E.D.N.Y. Apr. 30, 2014) ("A termination [of a contract] that does not comply with contractual requirements is ineffective.") (citing *New Image Constr., Inc. v. TDR Enters. Inc.*, 905 N.Y.S.2d 56 (1st Dep't 2010)).

the Portfolio Collateral "[n]otwithstanding any other provision in this Indenture" and subject to the priority rights of other Notes in the waterfall.  Indenture § 5.10(a)–(f); *see also id.* § 10.3(e)(i) ("[T]he Trustee shall credit all proceeds received by it from the disposition of Portfolio Collateral to the Collection Account," which is then applied to the waterfall.); § 10.2; § 11.1.  And the Indenture's opening clause declares that "[a]ll representations, warranties, covenants and agreements made by the Co-Issuers herein are for the benefit and security of the Noteholders and the Trustee."  Indenture, Preliminary Statement.  An offer term that steers part of the purchase price to the lower echelons of the payment waterfall would contravene these terms.  No rational investor would have acquired the CDO's secured notes had it understood that the CDO's junior equity holders' authority under § 12.2 gave them the ability, effectively, to flip the sequence of CDO beneficiaries, so as to enrich themselves personally, and denude the CDO of value.

It is black-letter law that courts must reject interpretations of agreement provisions that are commercially unreasonable or illogical.  *See, e.g.*, *Katel Ltd. Liab. Co. v. AT & T Corp.*, 607 F.3d 60, 65 (2d Cir. 2010) ("declin[ing] to endorse" "interpretation of the Agreement [that] leads to an illogical result"); *Cole v. Macklowe*, 99 A.D.3d 595, 596 (1st Dep't 2012) ("[It is a] well settled principle that a contract should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties."), *aff'd*, 999 N.Y.S.2d 403 (2014); *Matter of Lipper Holdings v. Trident Holdings*, 1 A.D. 3d 170, 171 (1st Dep't 2003) (same); *see also Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986) (contracts should be examined "in light of the business purposes sought to be achieved by the parties") (citation omitted); *ERC 16W Ltd. P'ship v. Xanadu Mezz Holdings LLC*, 95 A.D.3d 498, 503 (1st Dep't 2012) ("It is a longstanding principle of New York law that

a construction of a contract that would give one party an unfair and unreasonable advantage over the other, or that would place one party at the mercy of the other, should, if at all possible, be avoided.") (collecting cases).

Such is the case here.  The "business purposes sought to be achieved" through this CDO as reflected in the Indenture, *Newmont Mines Ltd.*, 784 F.2d at 135, were to benefit first the highest priority investors, *see* Indenture §§ 5.10; 10.3(e)(i); 11.1, not to enrich the lowest priority investors at their expense.  Gubin's reading of §12.2 would permit this result and thereby turn the Indenture on its head.  Indeed, at argument, strikingly, Gubin asserted that the Preferred Shareholders had authority under § 12.2 to direct the Trustee to accept a successor offer for CDO that paid the Noteholders only $1, but gave the decision-making Preferred Shareholders a resort island.  *See* 6/19/2015 Tr., 10–11.  That proposition is absurd.

Gubin makes two contrary arguments.  Neither is unpersuasive.

First, he argues, Brogno's side-payment is permissible because the Indenture's definition of Offer "does not prohibit (or even mention) a consent payment."  Gubin Br. 15.  Gubin argues that it is improper to impute terms of limitation to § 12.2, *i.e.*, to read the term "Offer" to mean "*valid* offer" or "*bona fide* offer."  *Id.* at 14.  But, as noted, the term "Offer" as defined in the Indenture incorporates the customary meaning of an "offer," meaning one capable of acceptance, and for the reasons stated, Brogno's was not.  By Gubin's logic, an offer to the Preferred Shareholders accompanied by a gun to their heads—such that their acceptance would be a product of duress—would also be permissible because the term "offer" in § 12.2 is unconditional and does not expressly exclude that scenario, either.  Simply put, that an offer is capable of acceptance—that it is valid—is implicit in the term "Offer" as used in § 12.2.  It was not

26

necessary that the parties to the Indenture enumerate every specific ground on which an offer

might be invalid (*e.g.*, fraud, duress, mistake, misrepresentation, lack of capacity).[9]

Second, Gubin relies upon an Indenture provision (§ 6.1(a)(1)) that provides that, with

certain exceptions, "no implied covenants or obligations shall be read into this Indenture against

the Trustee." But this provision is inapposite. It applies to the Trustee, and reflects longstanding

New York law that limits *the Trustee*'s duties to those specified in the Indenture. *See, e.g.*,

*Meckel v. Cont'l Resources Co.*, 758 F.2d 811, 816 (2d Cir. 1985). This limitation is specific to

the role of the Trustee. *See Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66,

71 (2d Cir. 1988) ("[I]t is no surprise that we have consistently rejected the imposition of

additional duties on the [indenture] trustee in light of the special relationship that the [indenture]

trustee already has with both the issuer and the debenture holders under the indenture."). It has

no bearing on whether other actors charged with responsibilities under the Indenture (*e.g.*, the

Preferred Shareholders) *are* subject to implied duties, such as a general duty of good faith. And

the Trustee and the Preferred Shareholders play different roles. The Trustee holds the Portfolio

Collateral, collects proceeds, and distributes them to Noteholders in accord with an established

payment waterfall. The Preferred Shareholders, in contrast, are entrusted with discretion to make

sales decisions on behalf of all investors. The limited duties the Indenture assigns the Trustee

are irrelevant to whether the Preferred Shareholders' sale-approval authority is subject to an

implied duty of good faith and fair dealing.

---

[9] Gubin suggests that Brogno's offer was valid because the *Hildene* decision held that the Indenture does not prohibit consent payments. *See* Gubin Br. 15. But Gubin badly misreads *Hildene*. In the pertinent point there, Judge Nathan ruled on a different question: whether the Indenture "authorizes or requires Wells Fargo"—the trustee—"to collect [] side payments." 2012 WL 3542196, at *7. Judge Nathan had no occasion to address, let alone resolve, the issue here involving side-payments to induce Preferred Shareholders to approve a purchase offer.

In sum, the requirements of § 12.2 were not met here because Brogno's offer, with its embedded side payment, was not one that the Preferred Shareholders could accept, consistent with their duties, and thus did not qualify as an "Offer."  As a result, at the time that Gubin offered $800,000, the Security was not "the subject of an Offer."  The Preferred Shareholders' direction to the Trustee to sell the Security pursuant to § 12.2 was, therefore, invalid.  Gubin's motion for judgment on the pleadings therefore must be denied, and Montrose's motions for judgment on the pleadings must be granted.

### iii.        Other Requests for Relief

Because the undisputed facts establish that the Trustee was not required or empowered under § 12.2 to sell the Security in response to Gubin's offer, there is no need to proceed to discovery.  Waterfall, for example, makes various factual allegations, to the effect that Brogno and Gubin are affiliated, and/or that there has been improper collusion between them and the Preferred Shareholders.  But such facts, even if established, could do no more than provide an alternative basis on which to hold that Gubin's offer did not satisfy § 12.2.

Nor is there any need to address Montrose's request for reformation of the Indenture. Montrose pled reformation as an alternative, and secondary, cause of action.  Montrose Ans. ¶ 57.  Primarily, Montrose sought a declaration that the Trustee lacks authority to consummate a sale of the Security to Gubin under § 12.2 "because . . . there is no extant offer to purchase the Portfolio Collateral which could conceivably form the basis for any sale of the Portfolio Collateral under Section 12.2 of the Indenture."  *Id.*  The Court has granted this relief.  This moots any request for reformation.

And the Court's decision creates no evident need for reformation of the Indenture.  The decision today is instead a product of case-specific facts, to wit, the problematic nature of

Brogno's idiosyncratic offer.  The Court's decision ought not present any impediment to the Trustee's practical ability in the future to sell collateral under § 12.2.  To be sure, at argument, counsel stated that in light of the ruling in *Hildene* that § 10.3 is ambiguous, it is unclear what authorization would suffice under § 10.3 to permit the Trustee to sell collateral in response to a first offer.  But this Court has not found any such ambiguity in § 12.2, which, as Judge Nathan recognized, is differently worded from § 10.3.  This Court has instead held that because Brogno's flawed offer was not an "Offer" within the meaning of § 12.2, Gubin's ensuing offer was not a follow-on to a valid offer—which was the sole basis on which WMH had approved it. *See* Scholnick Aff., Ex. D ("[WMH] certifies pursuant to the requirements of Section 12.2 that the sales price [offered by Gubin] for such Security is equal to or greater than the price available pursuant to the [Brogno] Offer . . . .").[10]

The mechanism provided by § 12.2 permitting a sale of collateral in response to the second of two offers therefore remains intact and uncompromised.  Although this mechanism— requiring as it does two offers before a sale can be approved—may not be an optimal means for selling CDO collateral, no party has argued to the Court there is no means consistent with the Indenture by which CDO collateral can be sold.  Further, as counsel have argued, it is possible that other provisions in the Indenture may provide separate bases for authorizing a sale.  *See, e.g.*, Indenture §§ 5.14, 10.3(d), 12.3(b).  Such questions are beyond the scope of this decision. And in the event that the Trustee were to conclude that the Indenture as construed does not leave

---

[10] The parties agreed that this case does not implicate § 10.3.  *See, e.g.*, Gubin 10.3 Letter ("Section 10.3(d) does not apply to the facts alleged in the pleadings."); *id.* ("Because this action involves a proposed sale to Gubin—an alternate buyer—Section 12.2 governs, and Section 10.3(d) does not apply."); Gubin Opp. Br. ("[T]he parties agree that Section 10.3 should have no bearing on the outcome of the pending motions.'"); 6/19/2015 Tr., 23 ([Gubin's counsel:] "Your Honor, the decision in this case doesn't depend on 10.3.  We agree with Montrose on that.").

a workable means for selling portfolio collateral, the Indenture provides procedural solutions. The Indenture can be supplemented or amended by the Trustee and the Co-Issuers in certain circumstances, *see, e.g.*, Indenture §§ 8.1(6), 8.1(8), or reformed.  And to the extent there is ambiguity, the Trustee can seek clarification from a court through a trust instruction proceeding. *See, e.g.*, *In re Trusteeship Created by Am. Home Mortgage Inv. Trust 2005-2*, No. 14 Civ. 2494 (AKH), 2014 WL 3858506, at *12 (S.D.N.Y. July 24, 2014) ("Trust instruction proceedings are a well-established procedure by which trustees (and other affected parties) can seek judicial guidance from the court about how to resolve immediate and difficult issues of interpretation of governing documents.") (citing *Moser v. Darrow*, 341 U.S. 267, 274 (1951)).

## CONCLUSION

For the foregoing reasons, the Court denies Gubin's motion for judgment on the pleadings, and grants Montrose's motion for a judgment on the pleadings, to the extent that Montrose seeks a declaration that the Trustee lacks authority, under the Indenture, to sell the Security to Gubin as directed by WMH on October 14, 2014.  The Court also denies Gubin's motion to strike exhibits attached to Waterfall's submissions.  Because the Court's resolution of these motions leaves no live controversy, the Court denies all other requests for relief as moot. The Clerk of Court is respectfully directed to terminate all pending motions, and to close this case.


SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge

Dated: August 31, 2015
        New York, New York

30